[Civ. No. 20511. Third Dist. June 30, 1983.]

RICHARD A. WHEELER, Plaintiff and Appellant, v.
STATE BOARD OF FORESTRY, Defendant and Respondent.

COUNSEL

Iwama & Castro, Kronick, Moskovitz, Tiedemann & Girard, Thomas C. Hughes III and Frank A. Iwama for Plaintiff and Appellant.

George Deukmejian, Attorney General, R. H. Connett, Assistant Attorney General, and William D. Cunningham, Deputy Attorney General, for Defendant and Respondent.

OPINION

BLEASE, J.—Richard A. Wheeler appeals from the judgment denying a writ of mandate (Code Civ. Proc., § 1094.5) by which he sought to set aside the decision of respondent State Board of Forestry (board) revoking his license to practice as a registered professional forester. We will reverse the judgment.

Wheeler, a forester with 25 years experience, was registered as a "professional forester" pursuant to the Professional Foresters Law, enacted in 1976. (Pub. Resources Code, § 750 *ff.*) The law provides for disciplinary action for "gross incompetence in [the forester's] practice." (Pub. Resources Code, § 778, subd. (b).) The board found Wheeler guilty of gross incompetence and revoked his license: for having failed to properly estimate the amount of board feet of timber available for harvesting on property owned by Gerald and Paula Blakley; for marking numerous healthy trees on the Blakley property for harvesting in violation of board regulations; and for innocently participating in a real estate swindle. His license was also revoked for material misstatements in listing his company as timber owner in the timber harvest plan for the Blakley property and in falsely stating that insect infestation was of sufficient magnitude to warrant emergency harvesting in another timber operation.

DISCUSSION

I

Public Resources Code section 778, subdivision (b)[1] subjects a professional forester to disciplinary action if found "guilty" of "deceit, misrep-

---

[1]Public Resources Code section 778, subdivision (b) reads: "A registrant or certificant shall be subject to disciplinary action who: (b) Has been found guilty by the board of any deceit, misrepresentation, violation of contract, fraud, or gross incompetence in his practice."

resentation, violation of contract, fraud, or gross incompetence in his practice."

Wheeler was found guilty of gross incompetence in the preparation of plans to harvest timber on the property of Gerald and Paula Blakley. The board concluded he "represented to the Blakleys that about 25 to 30 MBF of timber were available on their Weimar property when he should have known that approximately 200 MBF of timber were in fact available for harvesting on that property."

The board concedes the comparison is both inaccurate (Mrs. Blakley testified that Wheeler said there were 30 to 40 MBF) and inappropriate (like "apples and oranges") because the former figure contemplated limited harvesting under an emergency notice and the larger figure was predicated upon a more extensive plan. The board suggests, however, that redrafting its factual premise on the basis of comparable figures would justify a finding of incompetence. It requests we distill from its fused harvesting figures an "essential" finding defendant incompetently estimated the amount of timber which could be harvested on the Blakleys' land. Granting the request only for purposes of argument, the finding remains unsupportable.

## A.

■ Wheeler was not charged in the accusation with gross incompetence for the claimed estimation error; rather, the error was charged as a "deceit, misrepresentation, or fraud in his practice," separate grounds of discipline under Public Resources Code section 778, subdivision (b), and on these charges Wheeler was exonerated.[2] This charging error is fatal to this finding, as are similar errors fatal to several other findings.[3]

The disciplinary proceedings are subject to the Administrative Procedure Act (hereafter APA). (Gov. Code, § 11501; Pub. Resources Code, § 776.)

[2]The board adopted the "Proposed Decision" of the administrative hearing judge as its decision (hereafter board's decision). It found Wheeler's miscalculation of the amount of timber on the Blakley property to be gross incompetence. (Board's decision, finding of facts, pars. V and XIII.) But such conduct was not charged as gross incompetence in the accusation. It appears in paragraph 4.d therein only as a separate charge of "deceit, misrepresentation or fraud." But the board found such conduct "does not constitute deceit, misrepresentation or fraud" (board's decision, finding of facts, pars. V and XII).

[3]Wheeler was found "gross[ly] incompeten[t]," though not so charged, by virtue of his innocent participation in a real estate swindle. (Board's decision, findings of fact, pars. VI and XIII.) The conduct was not charged as gross incompetence. It was charged in paragraph 4.h of the accusation as "deceit, misrepresentation or fraud in his practice" but was found in the board's decision *not* to be so (findings of fact, paragraphs VI and XII).

The error is repeated throughout the board's findings. (See also fns. 13 and 21.) This stems from a thoroughly garbled proposed decision, which does not track the accusation and which was uncritically adopted by the board.

An accusation is required to initiate the proceeding and must specify "the statutes and rules which the respondent is alleged to have violated . . . ." (Gov. Code, § 11503.) The fulfillment of this requirement is a statutory predicate for disciplinary action. It follows that the finding must be based upon the accusation. Here it was not. Disciplinary action cannot be founded upon a charge not made.

### B.

■ Indulging the assumption Wheeler was charged with gross incompetence, the finding suffers another terminal disability. There is a complete absence in the record of any statute, rule, regulation or evidence of an implied standard by which to measure the competence of his conduct.

■ As we have said, the APA requires, as a predicate to disciplinary action, that the accusation specify "the statutes and rules which the respondent is alleged to have violated." (Gov. Code, § 11503.) This provides a constitutionally required notice to the accused of the standards by which his conduct is to be measured. (See *Button* v. *Board of Administration* (1981) 122 Cal.App.3d 730, 738-739 [176 Cal.Rptr. 218]; see also *In re Ruffalo* (1968) 390 U.S. 544 [20 L.Ed.2d 117, 88 S.Ct. 1222]; *Cannon* v. *Commission on Judicial Qualifications* (1975) 14 Cal.3d 678, 696 [122 Cal.Rptr. 778, 537 P.2d 898].) It permits discipline to be imposed only for violation of an ascertainable standard of conduct.

The board relies on no standard other than is contained in the term "gross incompetence," as found in section 778. Since the term is not amplified by additional language of definition, its meaning must be discerned from what is semantically embedded in the phrase. We obtain that meaning from the usage of the phrase in comparable statutes regulating professional licensees.

■ The term "incompetence,"[4] as applicable to licensees, is defined as "a relative [term] generally used in a variety of factual contexts to indicate an absence of qualification, ability or fitness to perform a prescribed duty or function. [Citations.]" (*Pollak* v. *Kinder, supra,* 85 Cal.App.3d at p. 837.) This definition posits a rule only in specifying that incompetence has to do with ability, qualifications, or fitness to perform a *prescribed* duty. It does not tell us what is prescribed. It implies the board is delegated authority to prescribe standards of "ability," etc. relevant to the profession it regulates.

---

[4]We have no occasion to savor the flavor of "*gross* incompetence." (Compare *Pollak* v. *Kinder* (1978) 85 Cal.App.3d 833, 837 [149 Cal.Rptr. 787].)

■ The board has not exercised this authority. Despite its statutory authority to adopt rules or regulations "reasonably necessary to enable it to carry into effect the [disciplinary] provisions" (Pub. Resources Code, § 759) the board has adopted none by which to measure competence, let alone the estimating competence of professional foresters. Moreover, it introduced no evidence at the administrative hearing of a standard of professional practice which might measure such competence.[5] As respondent's counsel conceded at oral argument "there is no standard provided in the record . . . ." Rather, counsel appeals to this court to provide a standard of competence. The appeal must fail. The court lacks the authority[6] and the knowledge to do so. A court has no intrinsic knowledge of the accuracy with which a forester should estimate the board feet of timber in a forest. Without a standard, it cannot tell the board feet from the trees.

Since the board has not prescribed a standard by which to measure Wheeler's competency, it has failed the constitutional and statutory mandate of the APA and cannot show he was grossly incompetent.

## C.

■ A similar predicate for disciplinary action is contained in Code of Civil Procedure section 1094.5, which governs judicial review of quasi-adjudicative action. "[S]ection 1094.5 clearly contemplates that at minimum, the reviewing court must determine both whether substantial evidence supports the administrative agency's findings and whether the findings support the agency's decision. . . . [I]mplicit in section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514-515 [113 Cal.Rptr. 836, 522 P.2d 12].)

*Topanga* mandates there be a "bridge" between evidence and findings and findings and decision. This requires a legally valid warrant of some

---

[5] We do not determine whether evidence of a professional practice regarding the matter at issue, which might inductively imply a substantive rule of professional competence, is a sufficient "prescription" of a standard. If it is, the induction of a rule from practice necessarily requires the production of evidence of an ascertainable practice. There is no such evidence in this record.

[6] A court, of course, does have the authority to determine, by interpretation of the statutory language, the meaning of competence, that it has to do with ability, etc., and may determine whether a standard prescribed by an agency complies with this meaning. In other words, the court may determine the domain of competence, that it has to do with ability etc., but not the standards within the domain which relate such ability to professional performance.

kind,[7] which links the evidence to the findings and the findings to the order and which tells courts whether and to what extent the licensee's conduct has anything to do with the claimed ground of discipline. The only warrant which, measured by the disciplinary statutes, can validly bridge the analytic gap between the evidence of Wheeler's conduct and the decision imposing discipline is a prescribed standard of professional competence. There is none. The board's finding of gross incompetence does no more than bootstrap a standardless conclusion which is unreviewable and hence violates section 1094.5.

## II

Wheeler was also found grossly incompetent in that, "[i]n connection with the proposed timber operation on the Blakley property, [he] unnecessarily marked for harvesting numerous healthy trees. The Emergency Notice would not have authorized the felling of these trees." The finding is based upon Wheeler's testimony that, in addition to marking dead and dying trees for cutting, he marked healthy trees which were "susceptible to insects."

The validity of this finding turns upon the meaning of a board regulation. Section 4592[8] vests the board with authority to define emergencies warranting emergency harvesting and it has done so. Section 1050 of title 14 of the California Administrative Code, as applicable,[9] defined "[e]mergency" as "the necessity to immediately salvage down, dead, or dying timber, or to cut and remove timber where delay could cause appreciable financial loss, waste or loss of forest resources."[10]

---

[7]We do not survey the range of judicially acceptable warrants. The measure of a valid warrant turns on the nature of the reasons, principles, or rules deemed acceptable reasoning in the kind of case under review. (For a perceptive treatment of the logic of the matter see Toulmin, The Uses of Argument (1958).) Here the measure of the warrant is derived from the APA and the disciplinary statutes.

[8]Public Resources Code section 4592 provides: "Notwithstanding any other provisions of this chapter, a registered professional forester may in an emergency, on behalf of a timber owner or operator, file an 'emergency notice' with the department that shall allow immediate commencement of timber operations. Such emergency notice shall include a declaration, under penalty of perjury, that a bona fide emergency exists which requires immediate harvest activities. Such emergencies shall be defined by the board and may include, but need not be limited to, the necessity to harvest in order to remove fire-killed or damaged timber, or insect or disease-infested timber, or to undertake emergency repairs to roads."

[9]A new section 1052.1, has since been added which limits cutting due to insect infestation to dead or dying trees.

[10]The accompanying Administrative Code section 1052 provides for "presumptive conditions" of emergency. Section 1052 does not control here, contrary to the board claim, because it addresses only "presumptive conditions of emergency." The lack of a presumptive condition does not rule out a nonpresumptive emergency condition, if the emergency otherwise meets the regulatory standard.

The board's finding is premised on a reading of the regulation as precluding the emergency cutting of healthy but insect-susceptible trees. The regulation, as applicable, read differently. It contemplated emergencies requiring the "cut[ting] and remov[al] [of] timber" *in addition* to the "salvag[ing] [of] down, dead and dying timber,*"* to wit, susceptible trees. It permitted the prompt cutting of trees "susceptible" to infestation as a prophylactic measure to prevent an appreciable financial loss, waste or loss of forest resources. (But see now fn. 9.)

Since the board's finding is premised upon an incorrect regulatory standard, the finding may not stand.

### III

■ A similar issue is presented by the finding Wheeler made a "material misstatement" (Pub. Resources Code, § 4583.5)[11] when he identified his company, A-Z Forestry Corporation, as the "timber owner" in another timber harvest plan which he filed[12] on the Blakley property. (The Blakleys were identified as the "timberland owner(s).")[13]

Elsewhere we discuss the need to relate a material misstatement to a substantive ground of discipline. Here we reach only the threshold question whether there was a misstatement.

The finding turns upon the meaning of "timber owner," which is defined in Public Resources Code section 4527.5 as "any person who owns commercial timber, timberland, cutover land, or *timber rights,* including Christmas tree rights, on lands of another except a federal agency." (Italics added.)

The board says Wheeler was not a "timber owner" because his agreement with the Blakleys provided: "Title of said trees to remain with owner until

---

[11]Public Resources Code section 4583.5 provides: "If the board finds that the registered professional forester has made any material misstatement in the filing of any timber harvesting plan or report under this chapter, it shall take disciplinary action against him as provided under Section 775."

[12]Wheeler attempts to escape the terms of section 4583.5 by claiming that the plan was never "filed." It is true that a Department of Forestry witness testified that, upon the discovery of what the department considered a misstatement, the plan submitted by Wheeler was "returned . . . unfiled," but a reading of Public Resources Code sections 4581-4583.5, in which the terms "filing" and "submi[ssion]" are used interchangeably, shows us that, in section 4583.5, "filing" means the same as "submi[ssion]" of a plan.

[13]Wheeler was alternatively found guilty of gross incompetence on these grounds (board's decision, Pars. IX and XIII) though not charged as such in (par. 10.a) of the accusation. For reasons set forth in the text, the finding is not supportable upon such ground.

full and final payment by Contractor." Since title is not the exclusive measure of "timber owner," the board's argument fails. A contractual provision relating to "[t]itle" does not negate a claim to "timber rights" founded, as here, in the contract itself—i.e., rights to harvest timber and, upon proper payment, to resell it.

There was no misstatement.

## IV

█ Wheeler was also charged and found to have made "material misstatements" (§ 4583.5) in an emergency notice which he filed for a timber operation near Colfax, California, in that he falsely stated "the reason for filing the notice was an emergency created by insect infestation, necessitating immediate commencement of operations." The accusation said the "true reason" for the emergency application was to enable Wheeler and the timber purchaser "to begin harvesting operations sooner than would have been possible had they sought approval of the planned harvest through usual [department] procedures."

The emergency notice specified the nature of the emergency as "[d]ead and dying trees caused by insects and the necessity for immediate control and salvage operations." It said: "Trees are to be selectively logged to remove dead and dying trees and trees that are high risk or susceptible to insect attack and infestation."[14]

Wheeler was charged as being in violation of section 4583.5 (fn. 11, *ante*), which provides that if the board finds the forester made "any material misstatement in the filing of any timber harvesting plan . . . it shall take disciplinary action against him as provided under Section 775."[15] "Material

---

[14]The notice was filed on February 20, 1978. On February 23 the logging operation was inspected by a Department of Forestry inspector. It appeared to him healthy trees were being cut down and he had the work reviewed by a forest entomologist, who agreed with his conclusion. The operator was instructed to discontinue the work. A Department of Forestry entomologist testified at the administrative hearing that, although a small portion of the logging area showed a sufficient insect infestation of the pine trees to warrant an emergency procedure, the rest of the area was 75 percent Douglas fir and showed no signs of infestation. The only pest evident in the area posing a threat to Douglas firs was the flathead bore, and these insects were in such a stage in their life cycle that the operation could have been delayed for some months without harm.

[15]Timber harvest plan means any plan under article 7, beginning with section 4581, which embraces the emergency notice provisions of section 4592.

misstatement'' facially encompasses any statement, false in fact, which is material to the timber harvesting plan. However, a misstatement is not a sufficient predicate for disciplinary action, since section 4583.5 directs that disciplinary action must be taken "as provided under Section 775." Section 775,[16] in turn, directs that disciplinary action be taken only for "the acts or omissions constituting cause for disciplinary action." Such causes are specified in section 778.[17] (See fn. 1, *ante.*) Consequently, a material misstatement must also amount to a cause specified in 778, such as gross incompetence, deceit or misrepresentation.[18]

The board implicitly took this interpretive route in equating a misstatement with a misrepresentation. In the accusation misstatement was used in the sense of false statement made with intent to mislead or deceive. Wheeler was charged with alleging an emergency, not because of his belief there was an emergency, but to avoid the review procedure required of the ordinary timber harvesting plan (Pub. Resources Code, §§ 4581, 4582.7).[19] However, the board produced no substantial evidence of Wheeler's intent to deceive.[20]

---

[16]Section 775 provides in pertinent part: "The board may upon its own motion, and shall upon the verified complaint in writing of any person, cause investigation to be made of the actions of any person licensed pursuant to this article, and may temporarily suspend or permanently revoke the license of any person who is guilty of or commits any one or more of the acts or omissions constituting cause for disciplinary action."

[17]If section 4583.5 was the sole ground of discipline, every material misstatement, no matter how innocent and competent, would give rise to mandatory disciplinary action. We do not believe the Professional Forester's Law contemplates such a harsh standard.

[18]The charge is incorrect in specifying section 4583.5 as an independent source of disciplinary authority. The correct statement must link the material misstatement to a specific cause under section 778. This is the only way by which notice of the disciplinary significance of the misstatement may be conveyed to the licensee.

[19]The board found the statement in the notice "that the purpose of the proposed operation was the removal of trees infested by or threatened with infestation by insects [was] neither false nor untrue." If the statement was not false or untrue, it must have been true. Accordingly, it was only Wheeler's statement there was an emergency which the board found to be a material misrepresentation.

[20]The board asserts Wheeler told a forestry official, David Burns, he filed the emergency notice to avoid the delay occasioned by an ordinary timber harvesting plan. The record does not support the claim. Burns testified he did not remember what Wheeler told him were his reasons for securing the emergency notice "other" than to remove "insect infested trees," a reason the board found true (see fn. 19). Rather, after Burns told Wheeler he could not *continue* to cut healthy trees pursuant to the emergency notice, and that he would have to file a timber harvesting plan, Wheeler said "that to do that would cause unreasonable delay and a financial loss for the operation because *he would have to come back.*" (Italics added.) Clearly, Wheeler's response had to do with disruption of an on-going harvest rather than his reason for filing the emergency notice.

Intent to deceive might also be premised on a showing Wheeler knew the nature and extent of the insect infestation as related by the entomologist (see fn. 14, *ante*) and knew this situation did not qualify as an emergency. No such showing was made.

The thrust of the board's case was an uncharged[21] and standardless[22] theory of incompetence. As counsel for the board said in the trial court: Wheeler "appears to have only a marginal and confused understanding of the conditions under which trees can be cut under emergency notices." The board's finding is premised upon the theory Wheeler did not know the law applicable to emergency notices and did not know when timber was susceptible to insect infestation. Since Wheeler cannot be disciplined upon the basis of a charge not made (or which is standardless) and such charge is the (invalid) warrant for the inferential leap to a conclusion of deceit, there is no support for the board's finding.

Since none of the board's findings are sustainable, the judgment is reversed and the superior court is directed to issue a peremptory writ of mandate compelling the board to vacate its decision and to enter a decision in favor of Wheeler.

Puglia, P. J., and Carr, J., concurred.

A petition for a rehearing was denied July 29, 1983.

---

[21]The emergency notice was also the basis for a finding of gross incompetence (board's decision, findings of fact, pars. IX and XIII), but was not so charged in (par. 10.d) the accusation. Accordingly, for the reasons stated in the text, the board decision may not be sustained upon this ground.

[22]The board has prescribed no standard of gross incompetence. (See the prior text discussion on this topic.)